Taylor *v.* Griswold.

---

**JOHN TAYLOR and OTHERS vs. GEORGE GRISWOLD and OTHERS.**

The Passaic and Hackensack Bridge Company have a right to make a by-law regulating the mode of calling meetings of the stockholders for the purpose of electting officers.   Such a by-law is a reasonable and valid one, is not repugnant to the charter, nor to any law of the state.    And notice of an election given in the manner prescribed in the by-law, is legal notice.

Taylor *v.* Griswold.

Although neither usage nor by-law can repeal plain words in a statute, yet where the meaning of the statute is doubtful, usage is a rational guide to its construction.

The Passaic and Hackensack Bridge Company have no express or incidental power to make a by-law dispensing with the personal attendance of members, and permitting them to appear and vote by proxy. T e right of voting by proxy is not essential to the attainment of the objects and design of the charter, and is not given by the general clause in the charter authorizing the company to make by-laws for their government.

The obligation and the duty of corporators to attend in person and execute the trust or franchise reposed in or granted to them, is applied in and forms a part of the fundamental constitution of every charter in which the contrary is not expressed.

Whenever a by-law seeks to alter a well settled and fundamental principle of the common law, or to establish a rule interfering with the rights or endangering the security of individuals, or the public, a statute or other special authority emanating from the creating power must be shown to legalize it.

The stockholders of the Passaic and Hackensack Bridge Company are entitled to only one vote each, and not to a vote for every share of stock they respectively own. And a by-law of the company, declaring each proprietor entitled to as many votes as he had shares of stock, is contrary to the charter and void. The claim of having one vote for each share, neither rests on the common law of the land, nor any of its principles. It wholly depends on the grant of the legislature.

---

This was an application to set aside an election held for directors of the Passaic and Hackensack Bridge Company. Depositions taken by both parties, were read on the argument which took place at the last November term. *W. Pennington* and *Vanarsdale* argued for the applicants—*Dodd* and *Wall* contra.

The opinion of the court was delivered at this term.

HORNBLOWER, C. J. This is a proceeding under the fourth section of the act to prevent fraudulent elections by incorporated companies, &c. passed the 8th of December, 1825. On the 3d day of August last, an election was held for directors, &c. of the Passaic and Hackensack Bridge Company, which resulted in the choice of George Griswold and others. An application is now made by John Taylor and others, to set aside that election on three distinct grounds, viz :

1. That notice of the time and place of election was not given according to law.

2. That the inspectors acted contrary to law, in rejecting the votes that were offered by proxies; and

3. That the inspectors also erred, in allowing to each stockholder but one vote, instead of a vote for each share owned by him.

Each of these objections will be considered in the order above stated.

First. Was due and legal notice given of the time and place of holding the election?

At a meeting of the stockholders held on the 4th August, 1821, a by-law was passed, prescribing the mode in which all future meetings of the stockholders should be convened; and it is admitted that the meeting held on the 3d of August last, was called and advertised in conformity thereto. But, it is insisted, that the stockholders had no right to pass any by-law to that effect, because the charter has prescribed the mode in which such meetings are to be called, and how notice shall be given. The 3d section of the act incorporating the company, after naming the first president and other officers, proceeds as follows: " Which president, &c. shall continue in office during the term of one year from the time of passing this act, *or* until other persons shall be appointed in their stead, by a majority of the stockholders, at a meeting of the said stockholders to be convened for *that* purpose, *which* meeting may be called by *any three stockholders*, provided fifteen days notice of the time and place of *the said* meeting to be given in writing to each of the said stockholders residing in this state or in the city of New York, or left at his or her usual place of abode." And then the following clause is added; " and also that it shall and may be lawful for the said corporation, or a majority thereof, to appoint annually, or at any time *they* shall deem proper, a president, secretary, &c. or any other officer or officers *they* shall judge necessary." If the legislature have in this section laid down and prescribed the manner, in which *all* meetings of the stockholders for the purpose of choosing officers shall be called, then it must be conceded, that the by-law of the 4th of August, 1821, is illegal and void. *Angell & Ames on Corporations*, 195; *Child* v. *The Hudson Bay Company*, 2 *Pr. Williams*, 207. But

Taylor *v.* Griswold.

if the legislature have only prescribed the manner in which the first meeting for the choice of officers should be convened, then it is equally clear, that the corporation had, by *implication,* the right to prescribe the mode by resolutions or by-laws, in which subsequent.meetings should be called for the purpose of elections. *Angell & Ames on Corporations,* 63, *&c. Newling* v. *Francis,* 3 *T. R.* 189 ; *Rex.* v. *Westwood,* 7 *Bing.* 1 ; *S. C. in* 20 *Eng. Com. Law Rep.* 11, 59.

This presents a question of construction ; and we have nothing to lead us to the mind and intention of the legislature, but the language they have used, in connection with the object they had in view. Having erected the proprietors into a body politic, and appointed the first set of officers, it was natural and proper for the legislature to point out a mode in which the corporation might supercede or remove those officers and appoint others in their places, as well as authorize subsequent changes, and a succession of officers to be kept up. The officers named in the charter, were to continue in office one year, *or* until others should be elected *at a meeting* to be convened for *that purpose.* For what purpose ? Obviously, for the purpose of electing others in the places of those named in the act ; and then the charter prescribes the mode in which that special and particular meeting shall be called ; " which meeting may be called by any three stockholders," &c.

This was a just and reasonable provision ; for, the officers named in the charter, even if they had the power to convene a meeting for the choice of others, might have neglected to do so, or have thought proper not to exercise such power, and thus have perpetuated themselves in office. The legislature having thus organized the company, and made provision for removing the first set of officers, upon the call of any three stockholders, superadded the power to appoint, annually, *or oftener,* if they thought proper, a president, &c. or *such other* officers as they might judge necessary ; leaving the time, place, and manner of giving notice thereof, to be regulated by the company. This power given by the latter clause of the section, to the " corporation, or a majority thereof," annually, or at any time, to appoint, &c. is utterly inconsistent with the idea, that *all* meetings are to be called in the manner pointed

Vol. II.—15

out in the former part of the section.    The call, there contemplated, is the voluntary and individual act of *any three* stockholders; but the authority given in the latter clause, is to be exercised by, and to be, the act of " the corporation or a majority thereof." Upon any other construction, no new *or other* officers could be appointed by the corporation ; and any three stockholders, might, at any time, convene a meeting for the purpose of an election, contrary to the will of the corporation, acting in its collective and legislative capacity, lawfully expressed.

I am therefore of opinion, the corporation had a right to make a by-law, regulating the mode of calling meetings for the purpose of electing officers.    The by-law in question, is a reasonable one ; not repugnant to the charter, nor to any law of the state.    It is, therefore, valid ; and the meeting on the 3d of August last, having been called in conformity to it, the first objection is not well taken, and must be overruled.

Second.  Did the inspectors of the election, act contrary to law, in rejecting the proxies ?

If corporations have a right to dispense with the personal attendance of their members, to conduct their affairs, and decide their elections by the instrumentality of proxies or attornies, we must find it in the elementary principles of the institution ; in the nature, design, and fundamental constitutions of corporations ; or in some new and positive enactment or grant of the creating power.    In other words, we must find such authority among the incidental rights and attributes of all corporate bodies, or in some special power granted by the government to the particular corporation in question.

The right of voting by proxy, in this case, is claimed by the applicants ; first, upon general principles; and secondly, upon the ground of an existing by-law, or the usage and practice of the company.

. 1st. The first inquiry then is, whether, upon general and common law principles, the members of *any* corporation have a right, as a matter of course, to be represented, and to vote by proxy ?    This question must be answered in the negative. It is clear, that when the charter is silent, and no by-laws have

Taylor *v.* Griswold.

yet been passed, regulating the mode of election, and of voting upon other questions that may arise in conducting the ordinary and appropriate business of the corporation, the corporators, when lawfully assembled, must be governed by the same rules and principles that prevail in *all* primary assemblies. That is, until a different rule has been established by some competent authority, every question must be decided, and every election determined by the majority; or in other words, by the major part numerically, of those who are personally present, and voting. To illustrate my meaning, let it be supposed, that the charter expressly authorizes the company to determine whether the members of it, shall be permitted to vote by proxy or not: At the very first meeting of the company, the question is proposed, How shall members vote on this question? In person or by proxy? Certainly not by proxy; for that would be to admit proxies before there is any law to authorize their admission. This primary vote must then be given and determined by the majority of the corporators present and voting in person. *Angell and Ames on Corporations,* 67 ; *Rex* v. *Foxcroft,* 2 *Burr. R.* 1017 ; 2 *Kent's Com.* 1st *Ed.* 236 ; *Phillips* v. *Wickham,* 1 *Paige's C. R.* 598. And to these authorities may be added, *The State* v. *Tudor,* 5 *Day's Rep.* 329 ; for the court in that case, fully admit the general rule as above stated.

2nd. But secondly, the right of voting by proxy in this case, is claimed under existing by-laws, or the usage and practice of the company. The validity of this claim depends upon the answer which must be given to another question, namely: Whether this corporation, either *incidentally,* or in virtue of any thing contained *in* the charter, has a right to make such a by-law, or to adopt such usage? Let us then inquire, first, is the right to make such a by-law, one of the natural and incidental powers of a corporation? When the crown creates a corporation, it grants to it, by implication, all powers that are *necessary* for carrying into effect the object for which it was created. This is according to the legal principle expressed in the maxim, " *Qui concedit aliquid concedere videtur et id, sine quo res ipsa esse non potest.* 11 *Co.* 52. It is, therefore, incidental to every corporation, to have the power of making by-laws, regulations and ordinances, relative to the purposes for which it was insti-

tuted. *Sutton's Hosp. case*, 10 *Co.* 31, *b*; *Norris* v. *Stapps, Hob.* 211, *City of London* v. *Vanacker*, 1 *Ld. Raym.* 496; *Rex* v. *Westwood*, 7 *Bing.* 1; *S. C.* 20 *Eng. Com. Law Rep.* 11, 59; *Company of Felt makers* v. *Davis*, 1 *Bos. & Pul.* 100; *Rex* v. *Lyme Regis, Dougl.* 158.

But this incidental power of legislation is limited not only by the terms of the charter, according to the maxim, " *Expressum facit cessare tacitum*," ( *Co. Lit.* 210, *a.*) but by the spirit and design of the charter: the purpose for which it was created, the object which the crown or the legislature had in view, and the general principles and policy of the common law. *Angell & Ames on Corporations* 184, and cases there cited. *Sutton's Hosp. case*, 10 *Co.* 30; *Child* v. *Hudson Bay Co.* 2 *Pr. Wms.* 207; *People* v. *Utica Insurance Com.* 15 *Johns. Rep.* 383; *Firemen's Insurance Com.* v. *Ely*, 2 *Cowen's Rep.* 699; *People* v. *Tibbits, & al*, 2 *Cowen's Rep.* 358; *People* v. *Kip, & al.* 4 *Cowen's Rep.* 382, in note; *Angell & Ames on Corporations*, 188, *sec.* 4.

If in view of these first and elementary principles, we repeat the question whether the right to make a by-law, dispensing with the personal attendance of members, and permitting them to appear and vote by proxy, is incident to a corporation, the answer must be in the negative. Such a power is not essential, nor even *apparently necessary*, to carry into effect the objects for which corporations are generally created. If the question is again asked, in reference to this particular corporation, the same answer must be given, and more emphatically, for the same reason. " The true test of all by-laws," says Mr. Justice Wilmot, " is the intention of the crown in granting the charter, and *the apparent good* of the corporation." *Rex* v. *Spencer*, 3 *Burr. Rep.* 1838. What, then, was the object and design of the legislature in creating this corporation? That it was not for the purpose of instituting a stock company, merely or principally, for the acquisition of property, will appear in the sequel of this investigation. But it was to enable the owners or lessees of certain existing property, in the preservation and good management of which, the public had a deep and important interest, to adopt such measure as would give permanency and security to the institution, and be calculated to pro-

mote their own, and the public benefit. If from the nature of things, this charter would be inoperative, or in any measure fail to effect or secure the benign objects the legislature had in view, unless we annex to it the power of making *such* a by-law as the one under consideration, then it follows, that the corporation has the power by implication, and as an incident to the charter. But that the right of voting by proxy, is essential to the attainment of the object and design of the charter, will not be seriously pretended. If we test the validity of the by-law in question, or the incidental right of the corporation to make it, by the latter branch of the rule just quoted, viz: "The apparent good of the corporation," the claim will be found equally untenable. It may be for the personal convenience of members, but it cannot be for the good of the corporation, that its business or election should be conducted by proxies. The interest of the company, the good of the public, would be better promoted and more effectually secured by the personal attendance of, and mutual interchange of opinions among the members, than by the action of proxies. At least, this is the fair and legal presumption. If one member may appear and vote by proxy at elections, and on other matters of vital importance to the institution, then all may, and so the welfare and interest of the company and of the public, be utterly neglected. In short, so far from its being incident to a corporation, to make such a regulation, it is at variance with the spirit, and "with the fundamental principles of our civil and political institutions." And it is confidently believed, that not an authority can be found, nor a case produced in support of the position, that the right of making such a by-law, is *incident* to a corporation of any description, public or private.

Speculations upon the evil consequences that have resulted to many of our incorporated institutions, and especially to our banks, by this and other innovations upon the salutary principles and rules of the common law, do not become this place, or occasion; but may well deserve the grave consideration of another department of the government.

2d. The next inquiry is, whether the power of making a by-law, that members may vote by proxy, is given by the general clause in this charter authorizing the company to make

Taylor *v.* Griswold.

by-laws for their government? It is in the following words : "That the said corporation, or a majority thereof, shall, from time to time, &c. have full power to make such by-laws, resolves and regulations for their government, as they shall deem proper, which shall be binding on the said corporation in all respects : *Provided* they be not repugnant to any part of this act, nor to the constitution and *laws* of this state."

We have seen that the power of making such a by-law, is not incident to, nor one of the inherent rights or attributes of a corporation; and it remains to inquire, whether it has been delegated to this company by the general clause above recited. But if it shall be found that the clause referred to, confers no legislative powers on the corporation, except such as it would have possessed if that clause had been entirely omitted ; then the right contended for does not exist; since such an extraordinary power is not incident to, and cannot be exercised by a corporation, unless specially delegated by charter. What autority then is given by this clause to the corporation? In one word, " to make such by-laws for their government, as they shall deem proper, not repugnant to the charter or the laws of the state." But this is just what the corporation might have done, if no such clause had been inserted in the charter. For, the moment a corporation is created, the right to make ordinances for its good order and government, is tacitly annexed to it as a legal incident. *Sutton's Hosp. case*, 10 *Co.* 30, and other cases before cited. *Angell and Ames on corporation* 177, and cases there cited. If the legislature intended to delegate to this corporation, other and more extensive powers on this subject, than such as are incident to every corporation, they have utterly failed in the attempt, and we cannot mend the charter. The well known learning, industry and research of the counsel for the applicants, have failed to furnish us with a single case, except the one from *Day's Reports*, ancient or modern, at home or abroad, in which it has been judicially determined, that a corporation, either in virtue of its incidental powers, or of a general authority to make by-laws, like that given in this charter, may delegate to its members, the right of voting by proxy. But the confidence and zeal with which the claim to this right was urged and maintained on the argument, demands of us a

Taylor *v.* Griswold.

respectful and particular examination of the authorities that were cited. Chancellor Kent, in the second edition of his commentaries 294, after stating the general rule, that every vote must be given in person, adds, that " in the case of moneyed corporations, instituted for private purposes, it has been held that the right of voting by proxy, might be delegated by the by-laws .of the institution, when the charter was silent." This remark was evidently made in reference to the case of *The State* v. *Tudor*, 5 *Day's Rep.* 329. If the learned commentator had given to that decision, the high sanction of his approbation, it would certainly have added great weight, if not a preponderating influence, to the opinion of the court in that case. But the chancellor simply refers to it as a matter of legal history, intimates no opinion, and leaves the case to stand or fall by its own merits. In *Phillips* v. *Wickham*, 1 *Paige's C. R.* 598, Chancellor Walworth, after stating explicitly, that the right of voting by proxy, is not a general right, and that the party claiming it, must shew a special authority for that purpose ; and after adverting to the fact, that the exercise of the power by the Peers of England is, *ex licentia regis*, remarks, that " it may possibly be delegated in some cases, by the by-laws of a corporation where *express authority* is given by the charter, to make *such* by-laws, regulating the *manner* of *voting*." It cannot then be pretended, that either of the learned jurists, just named, are authorities for the doctrine. The former intimates no opinion in support of it; and the latter only supposes it *possible*, where the charter, *in terms*, authorizes *such* by-laws, regulating *the manner* of voting.

But it is said, that where the mode of election to corporate offices, is not prescribed by charter, or settled by immemorial usage, it may be wholly ordained and regulated by by-laws. This is the general proposition laid down by *Angell & Ames on Corporations*, 195, and is undoubtedly true. In such case, it is incident to the corporation to prescribe and regulate the time and place of voting, to appoint inspectors, to determine whether the election shall be viva voce, or by ballot; and perhaps, even to direct the form of the tickets. *Commonwealth* v. *Weolper*, 3 *Serg. & Rawle*, 29. It does not follow, however, that the corporation have a right to permit its members to delegate

Taylor *v.* Griswold.

their corporative rights, and send an agent or proxy, to repre-
sent, deliberate, judge and vote for them.   The obligation and
the duty of corporators to attend in person and execute the
trust or franchise, reposed in or granted to them, is implied in
and forms a part of the fundamental constitution of every
charter in which the contrary is not expressed.   Accordingly,
when we look at the cases cited by *Angell & Ames*, in support of
the general proposition above stated, we find they estab-
lish no more than the general principle, that corporations may
regulate the manner of elections, if they do not infringe their
charter, or the laws of the state.   *Newling* v. *Francis*, 3 *T.
R.* 189 ; *Rex* v. *Passmore, ibid.* 199.

The case of *The State* v. *Tudor*, 5 *Day's Rep.* 329, as I have
remarked before, stands alone.   The charter contained a gen-
eral clause, very much like the one in this case, authorizing the
company to ordain such by-laws as they might deem necessary
for the government of the institution.   It was, like this, the
case of a Bridge Company, and they had passed a by-law al-
lowing stockholders to vote by proxy.   The question was on
the validity of that by-law.   Six, of the nine judges, then com-
posing that respectable court, were of opinion, the by-law was
valid : the other three, one of whom, was the learned Mr. Jus-
tice Reeve, dissented.   Ingersol, justice, who delivered the
opinion of the court, seemed to think that incorporated societies
" whose object is the acquisition of property," stand, in this
respect, on a different footing from those which are " instituted
for the public good ; either for the good of the whole state, or
of a particular town or society."   In all corporations of the
latter kind, he agrees " most fully," that every vote must be
given in person, and then adds, " there is no deviation from
this rule ; the authorities on this subject are uniform ; yet, ba-
sing himself on the distinction thus intimated, and without the
support of a single authority, the learned judge proceeds, for
the first time, to establish the by-law in question.   With all
due deference to that very able and learned court, I cannot fol-
low in their steps, in a path so newly trod, and upon a line so
undefined and undefinable, as the one they have attempted to
mark out.   In this day of corporations, it is not easy to point
out so distinctly, the separating line between such as are cre-

Taylor *v.* Griswold.

ated merely for the acquisition of property, and such as are instituted purely for the public good, or the good of a particular district of country, as to render it a safe and certain criterion, by which to determine this question. If the right of voting by proxy, in the case now before us, depended upon the legal accuracy and soundness of that distinction, it would be necessary, before we could apply the rule, to ascertain the origin and true character and design of this institution : that is, we must first determine, whether it was formed merely or principally " for the acquisition of property," or, whether it was created for " the public good, or the good of a particular district of country." But, it is apprehended, such an inquiry would not, upon the doctrine contended for, lead to any favorable result for the applicants. Whatever may be its present object, or principal pursuit, it is very manifest from the history of the institution, as it may be read upon our statute books, that it did not originate in any project for private speculation ; at least so far as the legislature were concerned in its creation. The very first action of the legislature upon this subject, and several of the succeeding acts, had in view, a great public benefit and improvement ; and so far from proposing a private corporation or moneyed institution, they contemplated the erection of the bridges and roads, by means of lotteries and voluntary donations ; and the collection of no more tolls than would be necessary to maintain and keep them in repair. These bridges were intended to be, what bridges and ferries, really are, *publici juris.* *Vattel Book I. Ch.* 9, *sec.* 100, *&c. Charles River Bridge Company* v. *Warren Bridge Company,* 7 *Pick.* 495, *&c. Beekman* v. *Saratoga and Schenectady R. R. Comp.* 3 *Paige's Ch. R.* 45, 76. In 1790, when the first act was passed, the great highway between the eastern and southern sections of our country, lay through the town of Newark ; and in addition to the public spirited motive of facilitating the general course of traveling, it was considered immensely important to that place, and the whole district of country lying north and northwest of it, to secure the erection of good and permanent roads and bridges from Newark to the Hudson River. It is true, when it was ascertained that the object could not be effected by lotteries and private donations, certain individuals took a lease from the

Taylor *v.* Griswold.

commissioners, erected the bridges, divided the capital employed, into shares, and finally became incorporated by the charter now under consideration. There is, no doubt, a plain and obvious distinction, important for many purposes, between public and private corporations ; between such as are created for political and municipal purposes; and such as are instituted for the government of particular societies, or the management and protection of private property. *Dartmouth College* v. *Woodward*, 4 *Wheat. R.* 668. In corporations of the former class, that is, *public* corporations, the right of voting by proxy, is not claimed ; neither is it pretended to exist or be incident to all *private* corporations, as distinguished from public or political. In religious, literary and benevolent societies, no such right has ever been lawfully exercised, so far as I can learn. We must look for it then, among that class of *private* corporations which consists of canal, rail road, bridge, turnpike, banking, manufacturing and trading companies. But public good, is the avowed object of all such institutions ; and however private property and emolument may be involved, the public have a deep and important interest in the government and success of every one of them. In short, they are all, in an important sense, public institutions. A bank, whose stock is exclusively owned by individuals, is in legal sense, a *private* corporation, but its objects and operations, partake of a public nature, and the same may be affirmed of insurance, canal, bridge, turnpike and rail road companies. *Per Story, Just.* 4 *Wheat.* 669. If, however, the right of voting by proxy, is to be conceded to banking, insurance and mercantile companies, upon the ground that they are strictly *private corporations*, the same cannot be predicated of bridge, nor perhaps, of canal, turnpike and rail road companies. They certainly partake more of a public nature ; and the public have a more direct and immediate interest in their management. Banks and insurance companies may discontinue their operations when they please ; they are not compellable to lend their money to, or to underwrite for any individual. Manufacturing and trading companies may extend or contract their dealings, or close up their concerns, as their interest or caprice may dictate. But bridge and turnpike companies are bound to keep their bridges

Taylor *v.* Griswold.

and roads in repair, and to permit the public to use and travel upon them, on payment of the tolls established by law. Indeed, it is upon the plea of public good, or public convenience or necessity, that lands are taken and private property invaded, under legislative sanctions, for the erection of canals, rail roads, turnpikes and bridges. *Beekman* v. *Saratoga & Schenectady Rail Road Co.* 3 *Paige C. R.* 45 to 76; *Enfield Toll Bridge Co.* v. *Conn. River Co.* 7 *Conn. Rep.* 29; and *Rogers* v. *Bradshaw,* 20 *Johns. Rep.* 742, *pr. Kent, Ch.*

There is then, in my opinion, no such plain and palpable distinction between such corporations as are instituted for " the acquisition of property," and such as are created " for the public good, or the good of a particular town or society," as will justify the court in allowing to the one, and refusing to the other, a course of proceeding unknown to the common law, and at variance with its salutary principles on this subject. This latter remark, recalls to my mind another and conclusive argument urged at the bar, against the validity of this by-law. The corporation is restrained from making any by-law repugnant to the law of the land. The common law, which requires all votes to be given in person, is a part of the law of the land. The by-law in question, is repugnant thereto, and consequently void. It is no answer to this objection, to say, that such a doctrine, would render the clause in the charter authorizing by-laws and the incidental power of corporations to make them, nugatory. The answer is not true. They may make a by-law, though repugnant to the common law, where the charter either in terms, or by legal implication, contemplates a course of proceeding, contrary to the rules of the common law; or where such by-law is essential to carry into effect the legitimate objects of the charter. Besides this, there are many things indifferent to the common law; things which it neither forbids nor enjoins; as for instance, the time and place of meeting; the mode of transacting business; whether a member shall speak covered or uncovered, standing or sitting; and a thousand other matters that may and must be regulated by the by-laws of a corporation. But whenever a by-law seeks to alter a well settled and fundamental principle of the common law, or to establish a ·rule interfering with the rights, or en-

dangering the security of individuals or the public, a statute, or other special authority, emanating from the creating power, must be shewn to legalize it.

Nor can any argument be drawn, as was attempted at bar, and in the case of *The State* v. *Tudor*, from analogy between corporations, and the law and practice of partnerships and voluntary associations. They may attend to their business in person or by agents, or not at all, as they please. They act in their natural capacities, and upon their individual responsibilities. But corporations are created by, and amenable· to law; and when partners, or voluntary associations, ask for and accept a charter, they must .take it with all its restrictions as well as its benefits. They voluntarily relinquish just so much of their former, natural and individual rights and powers, as are inconsistent with the expressed, implied, or incidental terms of the charter. Neither is it a satisfactory argument, that if the right of voting by proxy is denied to these private corporations, many of the stockholders may never be .able. to .vote at all. The same argument would extend the privilege of voting by proxy to public and political corporations; and the same thing may happen if proxies are allowed. Feme coverts, infants, and persons non compos, cannot· make proxies ; at most, it is an argument, *ab inconvenienti*, and is fully answered by the reasoning of the court in the case of *Rex* v. *Ginever*, 6 *T. R.* 732. After all, admitting that the practice of voting by proxy, is not only convenient, but may be exercised with perfect safety and advantage, both as respects the welfare of the corporation and the security of the public, are we not called upon to do too much, when we are asked, in the absence of any adjudicated case amounting to authority, to establish the doctrine contended for ? It is a power that can only be delegated by the supreme authority of the state, and ought not. to be extended by judicial legislation. As the law now stands, the legislature can grant the privileges to such corporations as they please, and with such restrictions and limitations as in their wisdom may seem expedient ; but if this court undertake by judicial construction, to extend this right to all private or moneyed corporations, we impose upon the legislature, the necessity of inserting a restraining clause in every charter they

Taylor *v.* Griswold.

grant, unless they intend to delegate the right of voting by proxy.

The last, and certainly the most important, though by no means, the most difficult question, remains to be answered, viz :

Third. Are the stockholders entitled to only one vote each, or to a vote for every share of stock they respectively own? This question is not put in reference to the mere matter of election. The right to a plurality of votes, if it exists at all, extends to every subject that may be discussed, and every resolution that may be submitted at any meeting of the stockholders. The by-law does not restrict the right of voting upon shares, to the election of officers ; nor did I understand the counsel as confining the rule to that subject. Indeed it is not easy to perceive how it can be, or why it should be so limited. If the right exists under this charter, it is a general right, and may be exercised upon every subject.

To my mind, the answer to this question is perfectly plain, whether it is considered upon general and common law principles ; or upon the terms of the charter itself.

1st. Upon general principles. Every corporator, every individual member of a body politic, whether public or private, is, *prima facie,* entitled to equal rights. If, for political purposes, every person residing within the chartered limits, and possessing the requisite qualifications, whether rich or poor, is a corporator, and entitled to an equal vote in the administration of its affairs. So too, if it is a private corporation, *prima facie,* the same parity exists. In joint stock companies, the owner of one share or action of the capital stock, is, in general, a member of the company ; a corporator ; and as such, entitled to, and cannot be denied, the entire rights and privileges of a member. *Angell & Ames on Corporations* 62. Those rights and privileges, are definite and certain ; they cannot be greater or different in one member, than they are in an other. In *Rex* v. *Ginever,* 6 *T. R.* 735, the power of making by-laws, was delegated by the charter, in very comprehensive terms. A by-law, giving to the senior bailiff a casting vote in case of a tie, was held to be illegal. So a by-law, imposing an oath of office, where none was required by the charter, was declared to be invalid. *Rex* v. *Dean, &c.* 1 *Str.* 536. So a by-law, restrict-

Taylor *v.* Griswold.

ing or extending the right of admission as a member, or of eligibility to office, or prescribing new or additional tests, or qualifications to voters, is illegal. *Rex* v. *The Wardens, &c.* 7 *T. R.* 743 ; *Rex* v. *Tapenden,* 3 *East.* 186 ; *Rex* v. *Spencer,* 3 *Burr.* 1833 ; *The People* v. *Tibbits,* 4 *Cowen* 358 ; *The People* v. *Kip & al.* 4 *Cowen* 382 *in note*; *Angell & Ames on Corporations* 192 ; *ibid* 182, *&c.* But the by-law contended for in this case, is as obviously a violation of the charter, as were those in the cases just cited. The charter, if not in terms, yet in its spirit and legal intendment, gives each member the same rights, and consequently, but one vote: whereas, this by-law, gives them unequal rights, and an unequal number of votes. It makes one a member for one purpose, and another a member for another purpose. It imposes a test or qualification unknown to the charter, by which to determine how many votes a member may give; whether one, five, ten or fifty. In short, a by-law excluding a member from office, or from the right to vote at all, unless he owns five, or ten, or twenty shares, would not be a more palpable, though it might be a more flagrant violation of the charter. A man with one share, is as much *a member*, as a man with fifty ; and it is difficult to perceive any substantial difference between a by-law, excluding a member with one share from voting at all, and a by-law reducing his one vote to a cipher, by giving another member fifty or a hundred votes.

The legislature have thought proper, in some instances, to annex certain and different degrees of rights, to certain and different quantities of property ; sometimes they have given by express enactment, one vote for each share, and at other times, they have graduated the number of votes, by giving for each share not exceeding five or ten, one vote each, and then diminishing the number of votes as the number of shares are increased; but this charter is silent upon the subject, and therefore, the by-law is illegal and void.

2d. By the very terms of the charter, this question is completely put at rest. The first section incorporates the individuals by name, who were then the proprietors of the bridges; thereby conferring upon them severally, equal corporate rights and privileges, and making them, collectively, a corporate body. The second section, authorizes the company to purchase, and

Taylor *v.* Griswold.

with the consent of " a majority of the body," to sell real estate, &c. The third section appoints the president, secretary, &c., by name, to continue in office until others shall be appointed in their places "by a majority of the stockholders, at a meeting of the *said* stockholders;" and then adds, "the said corporation or a majority thereof," may appoint annually, &c. And by the fourth section, the power to make by-laws is given to "the said corporation or a majority thereof."

In the first place, it is obvious to remark, that this charter incorporates certain individuals by name; that they therefore, and their successors and assigns, collectively constitute "the corporation," "the body," politic and corporate. When, therefore, the second section speaks of the consent of "a majority of the body," what "body" does it mean? The answer is inevitable; "the corporate body," "the body," politic and corporate. But what composes that "body"? The aggregate amount of property? or the collective number of individual proprietors who were incorporated? Manifestly the latter. The corporation property is not, in any sense, "a body" politic. "A majority of the body" then, can only mean, a majority of the individuals comprising that body." The third section is, if possible, more explicit, and admits of no doubt. The officers named, are to continue until others are appointed—how? By "a majority of the stockholders," not by the holders of a majority of the stock. The difference between the two forms of expression, is too palpable to admit of illustration. To consider them as meaning one and the same thing, would be to confound all language and destroy the use of terms. The distinction is plainly recognized, not denied by the court in *Gray* v. *L. & S. Turnpike Co.* 4 *Rand.* 578, *Angell & Ames on Corporations* 290. But it is said the term stockholders, is not used in the general authority subsequently given in the third and fourth sections, to appoint officers, and ordain by-laws. That is true, but the terms used, viz: "The said corporation or a majority thereof," evidently mean the corporators, or a majority of them, unless the property constitutes the corporation, and not the stockholders.

There is nothing then in this charter to change the common law rights and relative influence of the individual corporators.

No rights or privileges are annexed by it to any specific or designated quantity of interest. It does not give the election of officers, and the control of the property to a minority of the corporators, as the by-law in question may do, and in practice as it seems by depositions, generally has done. If the charter gave to the stockholders a vote for every share, then they might claim and exercise that right, not on the mere ground of membership, but as a special chartered privilege. It was insisted, however, at the bar, that the legislature recognised the company when the act of incorporation was passed in 17ᵒ7, with their by-laws and usages as they then existed; that the charter was in the nature of a legislative confirmation of their pre-existing by-laws and regulations, one of which was, that members might vote by proxy, and have one vote for every share they owned. That, therefore, their right to do so, is a chartered right. This argument is too broad. If true, in its extent, the company could not repeal or modify any of its pre-existing rules. They have, upon this principle, become a part of the charter, part of its fundamental constitution, and cannot be changed, unless the charter gives the corporation power to do so. This it does not do. On the contrary, in terms, as well as on general principles, it restrains them from making any by-laws repugnant thereto. It is true, if an ancient, or other existing corporation, accepts a charter of confirmation, their rights, regulations and ancient usages, will not be superceded or impaired, except so far as the same are altered by, or repugnant to the new charter. *Newling* v. *Francis,* 3 *T. R.* 196; *Rex* v. *Westwood,* 7 *Bing.* 1 *S. C.* 20 *Eng. Com. Law Rep.* 11, &c. But this is not a charter of confirmation; it is an original charter, creating and giving life to what did not before exist. If, therefore, this corporation has now any by-laws in force, on the subject of elections, or in relation to any other matter, it cannot be because such by-laws existed prior to the charter: but because the corporation, since its creation, has adopted them, either by a formal act of legislation, or by tacitly conforming to such pre-existing regulations; and in either case, their legality and validity are liable to be questioned in this, and in other courts of competent jurisdiction. However prudent and adviseable, it is not necessary, that a corporation should

Taylor *v.* Griswold.

ordain its by-laws by a formal act of legislation, nor that they should reduce them to writing, unless required to do so by the charter: and this is all that is proved by the cases cited on this point. *Angell & Ames on Corporations*, 179, *&c. Union Bank of Maryland* v. *Ridgely*, 1 *Har. & Gill*, 324; *Rex* v. *Ashwell*, 12 *East*, 22; and see *United States* v. *Fillebrown*, 7 *Peter U. S. Rep.* 28; *U. S.* v. *Dandridge*, 12 *Wheat.* 69. Neither can the argument founded on the uniform practice and usage of this company, be maintained. It can have no prescriptive rights founded on immemorial usage; and the validity of any other must depend upon the charter. If that is ambiguous, or doubtful, usage may help us to fix the construction, but cannot alter its terms or change its fundamental constitution. *Rex* v. *Miller*, 6 *T. R.* 268; *Rex* v. *Varlo*, *Cowp.* 248, 250; *Rex* v. *Ashwell*, 12 *East*, 22; *Angell & Ames on Corporations* 64. Finally: the by-law in question is not authorized by the charter; is inconsistent with the popular spirit and design of the institution; is not essential or necessary to effect the object the legislature had in view; is contrary to the great principles and policy of our laws; and is not even for the *apparent* good of the company itself. It is, therefore, void. The object of the legislature was, to give permanency and protection to the public improvement that had been erected, and security to the individuals who had embarked in the enterprise. Instead of promoting and securing these legitimate designs, the tendency, at least, the *apparent* tendency, of the by-law in question, is to encourage speculation and monopoly, to lessen the rights of the smaller stockholders, depreciate the value of their shares, and throw the whole property and government of the company, into the hands of a few capitalists; and it may be, to the utter neglect or disregard of the public convenience and interest. I do not say, that such was the design, or that such has been the effect; but only, that the natural or probable tendency of the by-law in question, is to produce such a result.

If the by-law, allowing votes by proxy and a plurality of votes, had been a legal one, the vote repealing it, or rejecting the proxies, at the time of the election, could not have been justified or sustained; but as the by-law was illegal and void in itself, the proxies and the excess of votes, were properly

**Vol. II.—16**

rejected; and the application to set aside the election, must be denied. Void things are as no things; this is a universal rule. 22 *Vin. abr.* 13 *pl.* 16, 17; *Cable* v. *Cooper,* 15 *Johns. Rep.* 157.

I have not reached this conclusion, without the most serious and solemn consideration of the subject; and I may add, not without some reluctance, since a contrary practice has so long prevailed in this company. But my solemn conviction is, that *Ita lex scripta est.* The application must be denied.

FORD, J. The proprietors of the bridges over the rivers Passaic and Hackensack, held a meeting on the 3d of August, 1833, to elect officers for the corporation; when John I. Plume, James Ewing, Anthony Rutgers, and John H. Stevens, as directors, and Archer Gifford, as secretary, were run upon one ticket, and declared and returned by the inspectors, duly elected, over Anthony Dey, Abraham W. Kinney, Ashbel W. Corey and Frederick S. Thomas, as directors, and Aaron Beach, as secretary, who were run on an opposite ticket. These latter candidates now come before the court, as complainants, and allege, that the proprietors had no such previous notice that an election was to be holden as is directed by the charter to be given to them; and moreover, that they, the complainants, did, in fact receive a very great majority of the votes of the stockholders, at said election, and were duly elected, contrary to the return of the said inspectors; wherefore they pray that the election of the persons so returned by the inspectors, may be set aside and vacated, and that these complainants may either be declared to be duly elected, or that a new election may be ordered by the court, pursuant to the act of the 8th of December, 1825.

First, they complain, that the stockholders had no such notice of the election, as the charter requires to be given. On referring to the charter, it appears, that the *first set* of officers was appointed by the legislature, and was directed to continue in office, till others should be elected in *their* places, by a majority of the stockholders, to be convened by notice in writing, for that purpose, under the hands of any *three proprietors;* which notice should be served on every other stockholder, either in person, or by leaving it at his place of abode, whether in the

state of New York or State of New Jersey, for a certain number of days prior to the time therein specified for said election; and it is objected that no such notice was served upon, or left at, the abode of any of the stockholders prior to this election. Now, I think it must strike every person on a plain reading of these provisions, that they were made for that first election only, when the officers that had been appointed by the legislature were to be superceded by the power of the stockholders. They were to remain in office until a meeting should be called by a particular *form of notice.* This form of notice is prescribed in the charter, *for a special case ;* and the court has not the power to extend it to all cases. It would impose, by construction, an unreasonable hardship on this company forever, when there are no expressions contained in the act to justify it. If the legislature had intended it as a form of notice for *all* elections, they were able so to express it, and would not have declared it for only a particular case. This stock may be holden by persons, scattered as to their residences, from Buffalo in the State of New-York, to Cape May in the state of New Jersey; and if notice must be left at the *abode* of each stockholder, so many days prior to every common election, at the peril of its being all void, the expense and oppression would be intolerable. But no such rule is to be found in the charter. After providing for the special case before mentioned, it gives the proprietors a *general* discretion in a subsequent clause, to this effect: "and also it shall be lawful for the said corporation, or a majority of them, to appoint annually, or at any *other time* they shall deem proper, a president, secretary, treasurer and directors, or *any other officer* or officers they shall judge necessary." This latter regulation is not limited in its terms, like the former, to a case that is definite and special; but places as well the number of officers as the times of appointing them, by a general rule in the discretion and judgment of the company. By limiting no time, nor description of officers, nor form of notice, for common elections, it left the company at liberty to pass by-laws for regulating such elections as they should judge most convenient to themselves. This construction was put on the charter as long ago at least as the fourth of August, 1821, and how much longer, does not appear. At that time, they passed a by-law, re-

Taylor *v.* Griswold.

quiring notice of all elections to be given a certain number of days before the time it was to take place, by their secretary, in one newspaper published in New York and one in New Jersey; and this has been the usage of the company from that time to the present. And although neither usage or by law, can repeal plain words in a statute; yet where the meaning of the statute is doubtful, usage is a rational guide to its construction. *Angell & Ames* 64. And as notice was given of this election, in the manner prescribed in the by-law of the company, and there is nothing in the charter to the contrary, I am of opinion that the stockholders had legal notice of the election.

The second complaint, charges the inspectors with having rejected, illegally, every vote that was given by *proxy;* and, with having allowed to each proprietor, only a *single* vote, instead of as many votes as he had shares of stock. That the inspectors did so, is admitted; but whether in doing so, they conducted legally or not, under the charter, is the very point in controversy. It is, moreover, admitted, that if the votes so rejected, were *legal* votes, then the complainants had a great majority of the votes of the company in their favor.

The controversy thus stated, comprises two questions of law that have no connexion, and therefore each one must have a separate consideration. The question presented first for consideration, is, whether the proprietors had a right, under this charter, to vote *by proxies.* That a majority of them always supposed they had this right, appears undeniably by their originally enacting, a by-law, whereby it is declared, " *that each stockholder shall have as many votes as he has shares, by himself, or by proxy.*" This by-law was passed prior to their incorporation, while they existed only as associates; it was, therefore, not only as old, but even older than their charter; and had always and uniformly been acted on from that time until the election now in question. It is objected, that it had never been *re-enacted* by the corporation since it became a corporate body: But I apprehend the action of the company ever since its existence, so uniformly, under this law, is sufficient evidence of its adoption by the body. " It seems to be well settled that a corporation may adopt by-laws by its acts and conduct, as well as by an express vote in writing." *Angell & Ames on Corporations*

**179.** In the case of the *Union Bank* v. *Ridgely*, in the Court of Appeals of Maryland, 1 *Harris & Gill* 324, this point was expressly so decided. A set of by-laws which had been passed by that bank, while it acted as an association, and prior to its incorporation, was offered in evidence; and upon proof that they had been acted on, uniformly, by the bank, ever since its incorporation, the court held it to be sufficient evidence of their adoption ; although there was no record or minute of the fact. So in *Rex* v. *Ashwell*, 12 *East.* 22, a by-law was established upon proof of the invariable usage of it in the corporation, although it was not shewn ever to have been adopted in writing. And in the case of the *U. S.* v. *Fillebrown*, 7 *Peters* 47, it was held, that there is no such principle in law, as that all corporate acts must be in writing, unless the *charter requires them to be so done.* I feel constrained by these decisions, to conclude that this corporation has had a by-law in full operation, ever since its existence, authorizing its stockholders to vote by proxy ; if it was in the power of a by-law to confer such a right.

But the power of making by-laws, in all corporations, is laid under very strong restrictions and limitations, not only by the common law of the land, but likewise, and most commonly in the very charter itself, which constitutes the members a political body. Thus the charter which confers on the proprietors of these bridges, a general power " to make such by-laws for their government, as they may deem proper," immediately annexes a proviso, in the following very restrictive words : " *Provided that they,* (those laws) *be not repugnant to any part of this act, nor to the constitution and laws of this state.*" If, then, the by-law under consideration, be repugnant either to the *charter,* or the *law of the state,* it is *void,* by the words of the proviso. If the right of voting by proxy had been granted in the charter, no by-law to the same effect would have been wanted ; but the charter is silent concerning it. All it says, is, that the proprietors may *elect* such officers as they deem necessary ; but it does not say in what *manner* the vote shall be given. It is therefore left to be regulated as the corporation may direct by a by-law, provided that by-law be not repugnant to the laws of the state. We come then to the great question, does the *common law* allow any man to vote by proxy? If it

does not, then this by-law is repugnant to the common law of the state, and must be held void, under the proviso in the charter.

Now, the House of Peers in England, is a great body politic, whose members are well known to give their votes, if they please, by proxy ; and if they did so by common right, it would be an example of the exercise of this power at common law, and tend very strongly to the establishment of such a principle in all cases ; but they do so only in virtue of a *special licence* from the crown. And as to the House of Commons, there are *no means* by which its members can ever exercise this power. 1 *Arch. & Chris. Bl. Com.* 168, *note* 4; and 4 *Inst.* 12. If then this power is denied by the common law, to those two of the greatest bodies politic in the nation, with all their rank and dignity, there seems to be no principle on which it can be accorded to inferior corporations. If they have it at all, it must come by *express grant* of the legislature. No corporation can assume it without such a grant, nor have courts of justice any legal power to confer or allow it.

So long ago as the year 1607, the claim of voting by proxy, came up before the court, in the case of *Pemberton* v. *Allen, Davis Rep.* 116, in ejectment. The Bishop of Fernes had demised his ecclesiastical possessions to Allen, the defendant ; but it could have no operation by law as a lease, until it should be confirmed by the corporation of the dean and chapter of Fernes. The dean, on going abroad, had appointed one Gray, as *his proxy*, to give his *assent*, to all leases and grants ; and Gray had expressed the Dean's assent to this lease, under the *seal* of the deanery. The court held, that it was a rule, of the *canon* law, that a vote could not be given by proxy ; *votum dari non potest per literas ;* and they decided, that the *common* law agrees with the canon law, on this point ; "for where a corporation will pass any interest, the common law will not suffer the members of the corporation to give their assent by proctors or substitutes." In proof of this position, a decision is cited as far back as 11 *Hen.* 4, *pl.* 64. Now the interests to be passed upon in this corporation, require the judgment of each member ; and it seems contrary to all principle, that he should delegate that judgment and trust to another. The proprietors, or a majority

of them, under this charter, constitute what may be termed, the business board ; not merely for electing officers, but for directing every step and measure of the corporation, which in other charters, is committed to the president and directors. It is by their discretion, that lands for the use of the corporation, are, from time to time, to be purchased; and those for which they have no further use, are from time to time to be sold and conveyed ; that bridges for public use and safety are to be repaired and renewed, that the quality of the material for constructing causeways, is to be decided on, and in short, it is by their counsels and wisdom, that all by-laws are to be enacted ; and how can the discretion thus delegated by the charter to each member, be delegated over by him to a proxy ?

Long after the foregoing decision in *Pemberton* v. *Allen*, the same point came before Lord Hardwicke, in 1750, in the case of the *Attorney-General* v. *Scott*, 1 *Vezy* 413, and received a like determination. The power of electing a minister for the parish of Leeds, was vested in twenty-five trustees ; by the decease of two of whom, it had devolved on the remaining twenty-three ; and twelve of them constituted a majority. The defendant, Scott, was elected minister of Leeds, by this *majority ;* but five of them, instead of voting in person, gave their votes by *proxy*. Lord Hardwicke, declared, that there is no instance where a trustee is allowed to make a proxy to vote in a personal trust of this kind ; they were to judge of the *qualifications of the candidates*, and could not *delegate* that judgment to others ; but ought to exercise it themselves ; that they might perform a *ministerial* act by proxy, such as signing the presentation to the ordinary ; but *election depended on judgment*, which must be exercised in person, and not by proxy. These decisions, resting on the great common law principles, that election depends on judgment, and that discretion must be exercised in person, and not by proxy, had set the matter at rest in courts of justice. Those who sought for the privilege of exercising such powers by proxy, applied for it to the legislature, who conferred it as we see in many charters by *special grant*, or refused it, as they deemed proper, in each case, and no instance was to be found of its being sanctioned at common law, without such *special grant*, until so late as the year 1812, when the

Taylor *v.* Griswold.

long repose of this question was disturbed in the supreme Court of Connecticut, in the case of *The State* v. *Tudor*, 5 *Day's Rep.* 329. Being argued before the nine judges of that court, the bench became divided upon it; but a majority of six against three, overturned the principles and decisions of the preceding cases, and decided them the other way. As they do not refer to a single adjudged case, but rely entirely on reasoning and analogy, it is not improper to examine their reasons. It was the case of a corporation for building a bridge, to whom the charter granted power to elect officers, and to enact *such* laws as they might deem necessary, " *not contrary to the laws of the state.*" The power of voting by proxy, was not specially granted, nor even mentioned in the charter; but the corporation had passed a by-law, assuming this power, and the court held, that voting by proxy, was valid under that by-law. They would not give an opinion whether voting by proxy was, or was not allowable at the common law, because they said they did not consider that question as being before them; whereas, the most infallible proof of the illegality of any by-law, is its being contrary to the law of the state; it is the *criterion* expressed in the very *charter*, and in rejecting this test, it appears to me, as if they had discarded the charter itself. They meant to test the by-law, they said, by its reasonableness; implying, that the law of a minor corporation may be reasonable, and at the same time be insubordinate towards the state, and in conflict with its laws. It is not in my power to assent to a proposition like this. The first reason they give for its being reasonable, is this—that the legislature had granted this privilege to all the *banking* institutions in the state; which argument amounts to this, that whatever power banking institutions obtain from the legislature, by a *special grant*, bridge companies shall have the same *without grant;* whereas the argument concludes, in my mind, exactly the other way; that if banking companies cannot vote by proxy, without a legislative grant of the right, bridge companies cannot do it, for the same reason. The next ground is, that voting by proxy is *calculated* to enable them to effect the objects of the corporation. The fallacy of this argument plainly appears, to my mind, from its proving too much: it implies that they may infringe upon the laws of

the state, if it is calculated to promote their objects; and if so, why not take timber for the use of the bridge, without compensation to the owner; or at their own price, without the expense or delay of an assessment? The only safe rule is, that they must pass no law, and do no act, but in subordination to the laws of the state. It is next argued, that partners in a voluntary association, may vote upon their concerns, if they please, by proxy; and from thence it is inferred, that the members of a *corporation* may do the same; not considering that a corporation acts entirely under *delegated powers*, and that a delegated discretion must be exercised in person, and cannot be delegated over again to another. This, likewise, is an argument that proves too much to be sound; for according to this analogy, voting by proxy would be lawful at town meetings, and by the trustees of universities, colleges, academies, and even parish meetings. The dangerous and novel lengths to which this analogy would stretch the common law, may easily be conceived. Finally, they advert to the distinction between public and private corporations, but do not cite a single instance where voting by proxy has ever been allowed in either kind, at common law, and their reasons seem so exceptionable and inconclusive, that their brethren in the minority, had ample grounds for their dissent, independently of the cases so solemnly adjudged, being all the other way.

But this very question came under the judicial consideration of the chancellor of New York, in the case of *Phillips* v. *Wickham*, 1 *Paige's Rep.* 590, seventeen years after that case in Connecticut, upon a claim of members to vote by proxy, in a corporation for the draining of certain lands. And the opinion of the chancellor is in harmony with that of Lord Hardwicke, with the court, in *Pemberton* and *Allen*, and the great principles there mentioned. He held, that the right of voting by proxy, is not a *general right;* that a *special authority* must be shewn for it; as in cases of *express grant* to the stockholders of some moneyed and private corporations; or else, that there must be an *express authority* to regulate the *manner* of voting.

Thus, when discretionary power of any kind is delegated to men by statute, the common law requires of them the *personal* exercise of that discretion, and will not permit them to dele-

Taylor *v.* Griswold.

gate it to another, to be exercised by proxy. This principle lies at the foundation of all the cases heretofore adjudged, (except that in Connecticut) and nothing short of a *special grant* of the legislature can overcome it. If the common law of the state authorized such powers as depend on *judgment and discretion* to be exercised by proxy and deputy, then the powers delegated to the judgment of arbitrators, referees, surveyors of highways, chosen freeholders, township committees, overseers of the poor, nay, justices of the peace and judges, might be executed by deputy or proxy. The restraint, in these cases, rests entirely on the great principle, that power delegated to judgment and discretion, must be exercised *in person.* This principle of the common law, does not seem to be denied; but its application to the members of a private corporation, is resisted. All the powers they have, are delegated to them by the charter; but then it is said, that they own *all the stock*, and the public, having no interest at stake, the members have a right to manage their affairs their own way. But that the public have no interest at stake, in these private corporations, will appear to be a mistake of vast magnitude, if it be considered how vitally these *corporations* are connected and interwoven with the most important public interests of the state, with the public highways, with the common transportation and exchange of commodities, with paper bills as mediums of currency, and their influence over commerce ; with agriculture, with manufactures, with education, and with religion. It is for the promotion of one or another of these great *public objects*, that these acts of incorporation have been passed. Knowing the influence they can exercise over these public interests, the legislature, instead of cutting them loose from the restraints of public law, has placed them in the most rigid subordination to it, by declaring in every charter, that they shall do no act contrary to the law of the land. They now seek to exercise powers, which are delegated to their *discretion* by deputy, which the law of the land has universally prohibited. If we bend the law to them, we must bend it to all others ; there is no stopping place at which we can refuse : but we have no right to stir a pebble of the common law. If the corporation really need this power, they must ask it of the legislature. They cannot assume it, nor can the court confer it.

Taylor *v.* Griswold.

In the second place, it is objected, that the inspectors allowed only one vote to each proprietor, although he was entitled, under a *by-law* of the company, to as many votes as he had shares of stock; and although this by-law had been in force, and in constant use, from the commencement of the charter. When this subject had been fully discussed by both parties in the company, the inspectors were of opinion, that the by-law in question was contrary to the charter, and therefore they restricted each proprietor to one vote. It cannot be denied, that a by-law contrary to the charter, is void from the beginning ; and that as to *usage*, it can never alter or repeal a statute ; otherwise, usage would be superior to the power of the legislature; and the usage of corporations could never be restrained within the limits prescribed to them. It is true, that when the words or clauses of a statute are ambiguous, or so uncertain, that recourse must be had to construction, courts of justice will, for the most part, to give to them that meaning which long usage has ascribed to them, rather than the contrary ; and this is the whole office of usage. But where the legislature uses clear and plain words, courts of justice will never suffer them to be set aside, either by usage or construction. This claim of having one vote for each share, neither rests on the common law of the land, or any of its principles. It wholly depends on the *grant* of the legislature. By some charters, it is specially granted, thus shewing, that the legislature know how to confer such a power, when they choose to confer it; while other charters confer it not, and as plainly shew, that such a grant was not intended. But in vain we look into this charter for any grant of the kind, and therefore, the conclusion is inevitable, that it does not exist. This is so decisive that it seems to preclude all necessity of further argument.

But the claim cannot consist with other provisions in the charter Thus it forms the proprietors into a common council, and confides to their discretion, not only the election of officers, but the whole management of corporate business, in all its departments and branches ; and the president and directors, *as this charter is constituted*, are only *ministerial* agents, to execute their resolutions ; and there is not a word in the charter that gives any superiority, to one member over another in council. It names the first twenty-

Taylor *v.* Griswold.

six proprietors, by their christian and surnames, with the most entire equality, and gives to a *majority* of them and their successors, the *joint powers* of the corporation. Wherever a statute names commissioners, or a majority of them, to perform any duty, and makes no distinction among them, the word majority necessarily means a majority of the *persons* who compose the commission. It makes them co-equals, in such appointment, and excludes every ground of claim for priority of one over another, whether founded on age, or wealth, or shares, or seniority in office. This principle, of equality of powers among such as are appointed by statute to the exercise of a trust or performance of duties, is of the most universal obligation. It is this which maintains an equality of power and responsibility among the surveyors appointed for the highways, the members of the board of chosen freeholders, overseers of the poor, and even the judges of the courts of common pleas, and of sessions ; the law which appoints several persons as *joint agents,* to perform any trust or duty, makes them to be all equal, in the power so conferred. These proprietors hold under the charter by one common appointment, which makes them equal as in all other cases ; and a by-law which destroys their equality in executing the high trusts committed to them, by giving to some of the members twenty times that power, in council, that it allows to others, and that changes this trust, by taking it away from *persons,* and vesting it in *shares,* is a direct contravening of the charter by which they were bound. This statute plainly ordains, that the proprietors shall express the corporate will by a majority of opinions ; it supposes each proprietor, or stockholder, to have a free will, and makes a majority of those wills to be the will of the corporation ; and any by-law running counter to this plain statute is manifestly a violation of it. It gives to some members *additional* votes, when by the charter they have but one. In *Rex* v. *Giniver,* 6 *Ter. Rep.* 732, a majority of bailiffs and aldermen had power by charter to elect a certain officer, and they passed a by-law, that if their voices happened to be *equal,* the senior bailiff should have a *casting vote.* The court held that this by-law was a violation of the charter, for if they could give one member a vote, not given by statute, they could give him six, or any other number.

The offices now in question, excite but little interest among

Taylor *v.* Griswold.

these litigants, on either side ; but the principles affect all corporations. The powers of a vote for every share, and of giving those votes by proxy or deputy, are conferrable only by the legislature ; they are not common law powers, and therefore the court cannot sanction them on common law principles. According to my understanding of the common law, there was no error in conducting this election, and the motion to set it aside must be refused.

RYERSON, J. gave no opinion, as the cause was argued before his appointment.

Application refused.

NOTE. This case was removed into the Court of Appeals, by writ of error. On the return of the writ of error, *Dodd* and *Wall* moved to dismiss the writ, on the ground, that the Court of Appeals had no jurisdiction. They insisted, that this was a summary proceeding, and that a writ of error could not be brought. A writ of error could only be used to remove a judgment final, or an award in nature of a judgment; that the decision of the Supreme Court was a mere denial of a motion and did not conclude the parties or settle their respective rights. They cited, 1 *Arch. Prac.* 208; 2 *Bac. Abridg* 452; *Co. Litt.* 288; *Comy. Rep.* 80; 1 *Salk.* 263; 1 *Ld. Ray.* 454; *Carth.* 494; 1 *Binn.* 222; 4 *Mass.* 488; 4 *Cranch.* 324; 6 *Peters* 656; 3 *Brown P. C.* 178; 5 *Cowen* 426; 7 *Cowen* 402; 1 *Stra.* 536, 625.

*Pennington* and *Williamson*, contra. The only mode of removing a decision of the Supreme Court to the Court of Appeals, is by writ of error; a writ of certiorari cannot issue, and this is an answer to several cases cited on the other side.

They insisted, that the decision of the Supreme Court was final, it established the election of one sett of directors to the exclusion of another. The proceeding, it was true, was summary, but it was made so by the act. The Supreme Court had original jurisdiction of the matter, and the legislature never intended to deprive the aggrieved party of the right of review in this court. The language of the constitution creating this court, was broad enough to give it jurisdiction of this matter. It was not necessary there should be a technical judgment, and cited, 6 *John.* 338.

They cited the case of the Middlesex election, 1 *Cox* 244; the case of *Lawrence* v. *Dickey;* the case of *The Township of East Windsor* v. *The Township of Montgomery;* the case of *Marsh* v. *Paterson Cloth Manufacturing Company*, as showing the practice of the court in analagous cases.

The court unanimously refused the motion to dismiss the writ of error. The President gave no opinion, as he had been counsel with one of the parties, before his recent appointment.

CITED in *Evans* v. *Adams*, 3 *Gr.* 379 ; *Eames* v. *Stiles*, 2 *Vr.* 493; *Harris* v. *Vandeveers Exr.*, 6 *C. E. Gr.* 444.